Driver, dependent, come. Are you on behalf of the dependent, come? Mr. I.H. Hanford. Are you on behalf of the dependent, not me? Mr. Richard S. H. Hanford. Mr. Andrews. A safe trip from Springfield. Indeed. Straight line almost. May it please the court, counsel. I represent Mr. Driver. I'm Alan Andrews from the Office of the State Appellate Defender. Mr. Driver has been convicted of armed robbery, sentenced to 20 years, and he has to serve 85% of that term. This appeals from the second stage dismissal of his post-conviction petition and from the dismissal of his Section 214.01 petition. The sole issue of Mr. Driver's trial was identity. Was he one of the two masked men who entered the convenience store, called a short stop, held it up, and one of the men shot the clerk? Mr. Driver's post-conviction petition raises a number of points concerning the validity of the jury's determination that he was one of those armed robbers, and that's what I intended to discuss here this afternoon. The first issue, Mr. Driver alleged that his aunt, Gloria Driver, contacted him or he contacted her after the trial, and she admitted to him that she'd been paid $100 by the state to testify, and that she had not actually seen him at the convenience store moments before, but had seen him hours before the robbery, and that she had mentioned that to the state's attorney, but the state's attorney had told her not to bring that up in court. This states a substantial violation of Mr. Driver's right to due process the use of perjured testimony by the state, and a conviction based on perjury must be set aside if there's a reasonable probability that the perjury affected the outcome of the trial. In this case, there plainly is. The state's case against Mr. Driver, I mean, there's sufficient evidence to convict him, but it's not a particularly strong case. The victim identified Mr. Driver, the store clerk who was shot, but his identification is questionable. There was a customer in the store who could not identify Mr. Driver. The two men were wearing a hoodie pulled down over their head and were wearing a mask across the face. So the extent of what the victim could see was the person's eyes and the bridge of their nose and obviously their skin coloring. So he had a very limited opportunity to observe the face of the perpetrators. And the victim also testified that since one of the robbers was holding a gun on him, he was quite frightened, which would have affected his ability to perceive. And finally, the victim identified Mr. Driver first from a photograph, from a photo array. And that identification is somewhat questionable because the victim conceded that at some point Mr. Driver had been in the store before. He'd known him as a customer, even though he couldn't really remember any of the circumstances, but he was familiar with Mr. Driver's face. And that quite conceivably could have prompted him to pick a familiar face out of this photographic array. Didn't one of the two actually call that witness by a nickname indicating some familiarity? The testimony wasn't the co-defendant. Mr. Ellis called the victim Bud, but there was no testimony that my client did anything of the sort. More of the evidence, there's circumstantial evidence concerning the escape. Various bystanders saw two men wearing hoodies run away from the shortstop, and as they passed various people, they wound up going into a house. Now, the police arrived at the house, the witnesses believe, five to ten minutes after the two men were in there. Eventually, Mr. Driver and the co-defendant, Mr. Ellis, were arrested as they came out of the house. So the inference, obviously, that the state wants everybody to draw is that since two men went into the house and two men came out, they are the robbers. And Mr. Ellis and Mr. Driver are the robbers. But again, five to ten minutes had passed before the police showed up to surround the house. So the perpetrators could have entered the house, hidden the evidence, the money, and left. And another point is there was a 13 or 14-year-old young man in the house who was five feet, eight inches tall. So in reality, there weren't just two people who might have been identified as adults. There were three. So the evidence that Mr. Driver was one of these two men running down the street, there's a long chain of inferences there. It's certainly not an absolute thing. Physical evidence linking people to the crime was found in the house, a gun, some ammunition, hoodies, masks, quite a bit. But again, the police were five to ten minutes behind the people who entered the house. So there would have been ample time even to hide it in a small attic, even to shove it in a canister of oatmeal, and then leave. The inference, again, is that it must have been Mr. Ellis and Mr. Driver. But again, that inference isn't solid. There was plenty of opportunity for the actual perpetrators to do so and leave. That brings us to the DNA evidence in this case. There was DNA from two items that were linked to Mr. Driver. But that evidence is placed in groups of one in three African Americans and one in four African Americans. And whatever you want to say about the admissibility of that evidence, which I'm going to touch on shortly, that's very, very, very weak DNA evidence. It's a very large group of people. And that doesn't even take into account the notion that the DNA may have been placed on the hoodie or on the sheet at some other time. After all, there was DNA from other unidentified people on these items. So there's no way you could argue that it had been in Mr. Driver's exclusive possession. Because of the weakness of the state's case, because there are flaws in every aspect of the evidence, Mr. Driver's aunt, Gloria Driver's testimony that she saw him standing in the parking lot of the convenience store wearing a hoodie moments before the robbery is very powerful evidence. And we have no idea at this point whether she perjured herself or not. She denied being paid at the trial. But, you know, Mr. Driver has alleged well-plaid facts that she's admitted that she committed perjury at the state's behest and that she was, in fact, paid. So did anybody actually ever find her by, you know, by the time this was just being litigated? Because he said he was having trouble finding her. Well, the state found her and obtained that improperly admitted affidavit. So there doesn't seem to be any doubt that the state can find Gloria Driver whenever the state wishes to. And, you know, the obvious difference is Mr. Driver's in prison with his 20-year sentence. And it's quite possible she does not want to cooperate with Mr. Driver and say, yes, I committed perjury. Whereas if a police officer and a prosecutor, say, shows up and says, are you willing to deny that you committed perjury, that's a much easier thing to stomach than to admit that you did commit perjury. I have to say her testimony was pretty hard to follow. You know, as I tried reading it, I kept thinking of politicians who don't answer the question that's asked. She was all over the place. And so when you say it was very powerful evidence, yes, she said that's my nephew or that's somebody. But she was really hard to follow. How could the jury follow that? Well, my memory of the testimony isn't as good as yours, but it did seem like perhaps she even had some issues or perhaps she was unhappy testifying against her nephew. But the simple fact, I think, is very powerful. And it comes down to that she did say I was walking by the quick stop. I saw my nephew. He was wearing a hoodie. I hollered at him. I went to the gas station. It was a little hard to follow how far away that was, but it's evident not far. And while I was there, I heard that somebody had been shot. So the evidence is that it was a short period of time before the robbery. The next point I would like to discuss is raising my fourth issue about trial counsel being ineffective for failing to move to exclude the state's DNA evidence. You know, they linked two of the items to Mr. Greider through DNA. That's linked sort of. One was a pink sheet that everybody thought was used as a face mask, and the other was one of the hoodies. Now, on the pink sheet, the DNA would occur in one of three African Americans, which is a very large group. And on the hoodie, it was one in four. Can I ask you, though, why isn't that just trial strategy? You know, let it come in and say it could have been anybody in the neighborhood. Well, I have two responses to that. First, we don't know whether it's trial strategy or not. We can't assume it, and that's the whole point of having a third-stage evidentiary hearing. If trial counsel can be cross-examined, we can find out whether it's trial strategy. There's no need to speculate. I can't conceive of a strategy that would be better. My second point would be, why try and explain it away when you can prevent the jury from even hearing about it? You know, the state points out that counsel said, well, there are 12, I believe it's 12 African Americans in the courtroom, and that doesn't exclude three of them. Well, the state thinks that's a good strategy, but I'm looking at it like, well, it does exclude nine of them. And that explanation makes it seem like the evidence is more probative than it is. The point is that counsel could have had it excluded, and that's better than any explaining it away because there's no benefit from minimizing it, because if you minimize it, there's still something there. But if you get it excluded, there's nothing. All right, well, on what basis would it be excluded, that it was just too large a group? The People v. Schultz case out of the 1st District in 1987 excluded it, and one out of five males,  And the point is the cases that have been cited, they all seem to go into this sort of harmless error analysis in determining whether it's even admissible. And I think what's actually going on there is there's really two prongs to a relevance inquiry. The first prong is that it's got to make some fact more probable than not. All right, well, this does that. I would concede that. But next, it can't be more prejudicial than it is probative, and I think that's where the courts are going off what they're actually trying to accomplish when they're looking at all the other evidence. And here it plainly is not more probative than it is prejudicial. You know, we as judges and lawyers understand that a match, not even a match, a correlation based on two out of 13 loci is really rather absurd. A one in three is really rather absurd. We're used to dealing with one in 1.4 trillion and matches of that nature. But jurors aren't like that. Jurors hear DNA. It's got a talismanic ring to it. They think it's infallible. That's why when the state doesn't have any DNA evidence, you see them vardering jurors about these CSI television shows. You don't expect us to have DNA, do you? And anyway, so the jurors are going to hear DNA. They're going to see one in three, one in four, which we don't think means much, but they do. And for that reason, the prejudice involved in this evidence far outweighs the very, very, very minimal probative value. And that's why under Schultz it was inadmissible, and that's why trial counsel was ineffective for failing to seek its exclusion and why appellate counsel was ineffective for not raising the issue. I'd touch on another issue because, again, it's related to the identification of Mr. Driver by the victim. The victim was tested for drugs at the hospital, and he had marijuana, amphetamines, and THC in his system. The doctor testified under questioning by the court that he didn't think that the victim was impaired, but he did say that it could have altered his sense of consciousness. Well, that's all we're talking about here is could it have altered his sense of perception, his ability to recollect, his ability to narrate. The jury could have accepted the doctor's opinion or it could have rejected it, but the jury should have heard this evidence that the victim was under the influence of drugs and that it could have altered his sense of consciousness. It's a minor point singly, but it fits in this whole pattern of the evidence of the identification being flawed. But doesn't it also serve to muddy up this person who, you know, with the collapsed lung and all the excessive bleeding, that, yeah, you know, this is what he thinks he saw, but, well, he's a drug addict. Well, I don't think anybody's going to be muddied up to the extent. When I think of muddied up, I think that, you know, the state wants to argue that we think the victim deserved to be shot, and I don't think that any jury in this day and age who hears somebody who's been smoking marijuana is going to think the victim is such a bad person that he deserved to be shot and the defendant ought to walk. So I don't think that it's muddying up, and I don't think that to bring this evidence out you'd have to launch into an assault on the victim's character. It would simply be, doctor, were there any drugs in the system? Yes, what were they? Could that have affected his perception in your doubt? And then you argue his perception may have been affected. But I don't think it muddies him up to the extent that the jurors would be so prejudiced that they'd want to let Mr. Driver go because Bud was a bad person. Now, in conclusion on these points, all of these errors are connected. They all go to the identification of Mr. Driver, and that's the only issue in this case. You know, you've got the photo array possibly being tainted by Bud knowing Mr. Driver a little bit. There's certainly a limited opportunity to observe, and the DNA evidence is very weak. When you put all that together and you add in Mr. Driver's testimony or her statement that she's committed perjury, we really need a third stage evidentiary hearing to clear that issue up and clear up the issues of whether or not trial counsel had any strategy on the ineffective assistance claims. Thank you. Just a second. I'm good. You'll have an opportunity for response. Thank you. All right. Good morning, Your Honors. London, please. It's afternoon. It is. Yes, it is. I'm not going back to this morning. I won't offer to take a poll if it's morning or afternoon. Oh, no polls. May it please the Court. Your Honors, I guess we agree it's a case about identification. However, to say that at any point Gloria Driver made a statement that she committed perjury is inaccurate. At most what we have is a self-serving affidavit of defendant that said, I contacted her by phone. This is what she supposedly told me. While that might be sufficient, and obviously this Court found it was sufficient, to get around the first stage, which is the gist of a claim. We're not at first stage anymore. We're now at second stage. And obviously the issue at second stage is, is there a substantial showing of a constitutional violation? There can't be. A defendant can't be able to say, here's my affidavit. Here's what I said. Aren't there certain exceptions to having an affidavit? There are. Why doesn't this qualify? I was going to get immediately after, but yes, there are very rare exceptions. There's a rare exception if a defendant can demonstrate that he was not able to contact the victim, or if he can demonstrate hostility. Neither of that happened in this case. Understand defendant mysteriously is able to contact his aunt by telephone, and then says, I can't find her again. Didn't attempt to say, well, I've contacted my mother, her sister. I contacted my relatives. Any actions I took to allegedly try to find her. In addition, the record demonstrates that counsel was appointed on PC two separate times. Counsel could have assisted defendant in finding or attempting to find the lawyer driver. Two separate times after counsel was appointed, counsel then withdrew because counsel basically went into court and said, I don't agree to adopt some of the frivolous issues that my client wants to pursue. And the judge examined and said, is that accurate, Mr. Driver? Mr. Driver said, yeah, I want to go pro se. He files an amended petition. The same thing happens. So counsel could have obtained. So yes, there are very limited circumstances. But as we cite, in the case law we cite, those circumstances have to be where defendant has demonstrated something. We cited a case that was directly on point where the court found where defendant said, here's two witnesses where not only did they testify, but my trial counsel was ineffective for failing to call these witnesses, and here's what they say. And the court said, no, no, no, that's not sufficient. You can't come up with even new witnesses and basically why this is a third stage hearing. We need to be able to challenge and examine what the affiant would say, not what the defendant would say. It's even more important in this case where we don't have new evidence. We have the defendant basically saying, well, my aunt committed perjury. She admitted she lied. And we're now speculating, well, she'd be less inclined to do that at a third stage hearing. She might readily do that in front of a prosecutor and police officer. Well, apparently she had no problem doing that at trial. She testified very strongly. And what I understand, Your Honor, are things that was a little bit convoluted, and it was, but it was clear. It was clear while some of the timeframe was a little convoluted, and again, more so as counsel has suggested, the distance of how far she traveled from the stop and go to the gas station and back. But she very clearly said, I saw my nephew. I called out to him. He turned and looked at me and kind of shrugged me off. I then walked to or towards the gas station. I heard a sound that I thought might have been a car backfire, but I later figured out was a gunshot when I went back to the stop and go and saw the victim, Bud, not clear whether it was a stretcher or whether he had staggered out of the store. And I then determined that that happened. That wasn't saying I saw Bud staggering out, you know, 10 hours before. That was very clear testimony, and obviously the aspect that we agree was powerful was this wasn't a stranger. This was someone that knew the defendant well and identified him as one of the two men that entered the convenience store just before the armed robbery and shooting occurred. And I think that that the extent that there was a bit muddled was you had an aunt that was reluctant to testify against a nephew. But yet she did. And the evidence indeed was strong and powerful. Regarding the concept of the admission of DNA, as opposed to Shultz, which says, well, it's error. The reason why it was error in Shultz is because it was the only evidence. You only had DNA. And to say that when you convict somebody based on a one in four or one in three chance, that is clearly inappropriate and defies justice. Oppose that to the Usilak case that the people cited. And they specifically said in Usilak it was any, if any, error. It's harmless. Why it's harmless? Because we had other evidence specifically very similar to our case, eyewitness testimony. Well, obviously we have that here in addition. Why was it trial strategy? It was trial strategy, I would say, for a couple of reasons. One, we disagree with the facts. It is very powerful to say, wait a second, one in three, one in four. The defendant's defense counsel very clearly said, hey, look around the room. There is 12, 18, I don't recall the exact amount of African-Americans here. Three or four of you could fit this profile. That in itself is a pretty strong argument to make to the jury. It's even more so in this case when one of the arguments was, wait a second, there weren't just two people. There was a third that it might have been. So based on the defense theory of the case, that would have been a very strong trial strategy. Let me digress for a moment, though, because we disagree with the facts, even though the strategy itself was pretty strong. What do I say, or how do I say we disagree on the facts? The only person that testified as to the fact that there may have been a third black male that could have been one of the two robbers was the co-defendant's girlfriend. Co-defendant's girlfriend testified, my son, even though he's 13 or 14, is 5'8". That was uncontroverted, but she's the only one that testified. However, even more so, and I apologize for not having the record site, but I do have a common law record site, and that's at C-504 and page 8 of this court's opinion remanding back that noted that the co-defendant's girlfriend also testified that she was not home at the time that defendant and co-defendant got there. And indeed, the evidence seems to suggest that none of her children were there either. She got home with a son, and we don't know if it's the son that is 5'8 or not, but she got home with a son, and defendant and co-defendant were there alone, and that her other children returned or entered the house at some time thereafter. So, yeah, there was this 5 or 10 minutes, but there's no evidence that during those 5 or 10 minutes, where the police very carefully were able to trace two men running from the store into the home, that anyone other than defendant or co-defendant were home. That plays strongly against the fact that the evidence, you know, was as weak as defense suggests. The last issue that defendant touched upon is the – Can I interrupt by asking one question? Yes. Counsel suggests that trial strategy is an issue for stage 3, not stage 2. I'm sorry? Counsel suggested that trial strategy, the concept of trial strategy rather than ineffective assistance, is really an issue for stage 3, an evidentiary hearing, not stage 2. Interesting argument, but there are many cases that on direct appeal where the court says it's a matter of trial strategy. It's not something where you can just allege it's not trial strategy or how do we know it's trial strategy? Let's have a hearing on it. You have to have some pretty strong demonstration that it wasn't or couldn't have been or that the decision was so aberrant that we better call the attorney to explain. The case law basically suggests that barring something, demonstrating that we assume, the assumption is that anything that can or should have been or that is left to the attorney – I get that, but is that assumption at stage 2 or not until stage 3? I mean, isn't the question stage 2, are these allegations now presumably the amended petition? Does it make a substantial showing, yes or no, without viewing any evidence in opposition? No, because you can't just say I've made a strong showing that it might not be trial strategy. You have to make a strong showing that but for that the prejudice was so overwhelming. So the question is if I guess the defendant alleges that but for this DNA evidence I wouldn't have been convicted, that's the showing that we then look at and say is that a substantial showing? And the answer is no, it's not because let's face it. Realistically, the DNA evidence is not the strongest and is not the evidence that the jury would have made that determination on. The jury, as I think this Court referred to when it remanded, the jury made the determination most likely based on the eyewitness identification and the stronger of the two eyewitness identifications was Gloria Driver. So without Gloria Driver, we'd have a difficulty. I mean, defendant might well not have been convicted. With Gloria Driver, regardless of the DNA evidence, I don't think that that's the issue. So we don't have to demonstrate a third stage and have counsel come in and say it was or wasn't. We have to demonstrate that that evidence was so prejudicial that but for it he wouldn't have been convicted. And we don't have that showing here. I don't think we really have much of the argument, much less a demonstration. When we reversed after the Stage 1 dismissal, we did have some interest in the Driver statement. And I realize there is a difference between a gist and a substantial showing, but if we had that interest at Stage 1, why shouldn't we have a similar interest now, that it's important to hear that? I guess if we were to say if we have an interest, and again, I have an interest in a lot of facts, but I try to tie it to the four corners of the evidence that's been introduced. The fact is it's not for this court to reweigh the evidence. It's for this court to say, okay, at first stage, we have an interest because if what defendant says is true, that satisfies the gist. However, all we have here is if what defendant says, I'm sorry, not if what defendant says is true, if what defendant says is taken as a well-planned fact, it satisfies a gist. It's not a well-planned fact here. Why? Because we don't just have the defendant's affidavit. We have the record that contradicts the defendant's affidavit. And this court and every other court has consistently suggested that. Because it contradicts what she testified to at trial. Defendant's affidavit? Defendant's affidavit is contrary to what Gloria Driver testified to at trial. Correct. And that's your position. And that you think that's what substantiates a stage 2 dismissal. Yeah. You have to, I mean, again, does it substantiate? No. The judge made the finding is this is hearsay. You can't just allege. If we were to ignore. Right. But part of that is then also to say that the absence of Gloria, presumably Gloria Driver's affidavit, is not otherwise explained away with those exceptions. Yes. That she's not available. And the court didn't really go into that. Correct. The Supreme Court did not go into that. Correct. So that's left for us to fill in the gap. Correct. Although, as we argued in our brief, the problem with that analysis is all any defendant, if we have an opinion that says that, all any defendant will do in the future, there is no longer an affidavit requirement for all practical purposes. Because then all a defendant has to do is say, if I call this witness, this is what the witness would have to say. And I can't find the witness. Regardless, I mean, we wouldn't have to have any showing of either of those. We wouldn't have to have any showing that Affion would actually say that. May I continue? Yes. We wouldn't have to have any showing of what Affion would actually say. And we wouldn't have to have any demonstration that there actually is an exception. And I think that's what the judge found. And that's what we suggest, that to the extent that the judge didn't specifically make a finding, that whether or not there was an exception, that this court should consider. Because anything other than that would simply be every defendant from this point on. Let's face it. In order to have a PC, you pretty much either have to be in jail or have your liberty impacted. Every defendant will say, I'm in jail. I can't, I'm not in the street. I can't contact anybody. Ironically, in this case, we already saw that's not true. He contacted, allegedly, he alleged he contacted Gloria. But he didn't show anything why there's an exception, again, other than his bald statement. And that's why, even though the trial judge didn't specifically implicate that aspect, the trial judge did say, this is total hearsay. There's nothing that he says here that is verified. It is contradicted by the record. I know your time is up, but that's a limitation on you. Of course. I borrowed that from Justice Thomas the other day. At any rate, do you want to just give us a couple minutes on your thoughts regarding the truth and sentencing provisions in the armed robbery? Sure. Twofold. One, I will suggest that, unlike the Smith case, and with all due respect, unlike this court's case, and I believe it is, even though neither party cited, I believe it's Perkins. The Castleberry is determinative. Castleberry says that a void, the void sentence rule is no longer applicable, is no longer in existence. What does that mean? We disagree with the first district. I have to say the first district's opinion was a bit convoluted because when they analyzed Teague, they had it backwards. They said, if it's not a new rule, then it's not retroactive. Well, obviously that's not what Teague says. Teague says, if it's a new rule, we have to look at whether or not it's retroactive, and then it depends on whether or not it's substantive or it's procedural. They found, well, this isn't a new rule. Why? Because we're really discounting a rule and returning to an old rule. I'm not sure that Smith actually, again, with all due respect to the court, made a lot of sense. What we do have, though, is the Supreme Court saying the void rule no longer is valid. So what does that mean? What that means is that you cannot challenge a supposedly void, or we would even change that and say illegal sentence. In our office, we kind of say void is a four-letter word because void and avoidable is so intermixed and misused. An illegal sentence, yes, of course, justice demands that it can be challenged. However, Castleberry says it can't be challenged in an untimely fashion, such as a 214-01. It's past the two years. It cannot be challenged. Therefore, arguably, it should end at that stage. Does that mean the defendant doesn't have a remedy? Of course not. But the remedy is an extraordinary one, and the remedy, as Castleberry suggests, even though they put the onus in that case on the state, the remedy is a mandamus action. And obviously that doesn't delay justice. It doesn't delay the defendant because he could have filed that at any point in time. He doesn't have to wait until this decision. But a mandamus past the two-year 1401 time frame is the appropriate remedy. More importantly, or as importantly, we didn't leave it there. We explained why the trial judge's finding, regardless of Castleberry, because, of course, the finding was prior to Castleberry, as was defendant's opening brief. I'm sorry, defendant's only brief. And that is that the judge properly found that there was not an illegal sentence. It was neither void nor avoidable, but more importantly, it was not illegal. Why? Because case after case, the LMS Supreme Court has found that the concept of accountability is if you are responsible for the conduct of a co-defendant, you're responsible for all of his actions. He did not find, and the trial judge did not find, a case directly on point referencing truth in sentencing. But what we did find were a number of cases that were analogous, or at least, you know, appropriately, where the court found that consecutive, enhanced, and extended sentences were all appropriately based on accountability. And why? The court says simply, we've been asked for years to change this ruling. We're not going to. We are following the statute. We are following what the meaning of accountability is, and that is we've fully reiterated our support that if you are responsible for the acts of counsel, for a co-defendant, you are responsible for all of their activity. And, again, I think one of the maybe the easier examples to use is the 15-year enhancement because of a weapon. So even if you aren't carrying a weapon, you clearly aren't discharging a weapon because you don't have it, and even if there wasn't an intent to go in and use that weapon, defendants have been found that they are accountable and they have the 15-year add-on because a co-defendant is carrying that weapon. In this case, this court commented when they remanded that the jury decision was curious. We don't disagree, but obviously it is not our role and the people can't challenge an acquittal. So, you know, we can't argue that, well, they maybe should have found him guilty of both. We don't know as this court did it. Why did they acquit him of the attempt murder and found him guilty of the armed robbery, both based on accountability? The answer is we don't know. We don't know if they didn't understand the law of accountability. We don't know if they were being, as this court suggested, generous. We don't know what the basis of the reasoning is. What we do know is that co-defendant was found guilty of both armed robbery based on great bodily harm and attempt murder based on great bodily harm. There is no dispute that the victim suffered great bodily harm. So if the defendant is found responsible for co-defendant's actions, is he responsible for all the conduct or is he responsible just for the conduct that he was found guilty of? And we believe that the analogous cases have said he's guilty for everything. He's guilty regardless of if he carried the gun, regardless if he was even like, you know, in the premises at the time. If he aids and abets, he's responsible for all the conduct. So the fact that defense argues that, well, maybe they thought that since they were exiting the store and co-defendant then turned around and shot him, so therefore the armed robbery had ended and the attempt murder was separate, that's not what the case law suggests. I've spent a few years here and I'm getting a little bit more sensitive and sometimes angry with statements like, well, that's probably the logical way to do it. I'll rule that it's 85%. You can take it up on appeal. Isn't that an abdication of the trial judge's responsibility in this case? It certainly is bothersome, to say the least, and I completely agree with Your Honor. If this was the issue raised in direct appeal, I'd have a lot more concern with that probably needs to be remanded. That statement in and of itself that that was all we had is certainly, I shouldn't say that, I'm representing people, most likely shouldn't be sufficient to uphold that sentence on direct appeal. However, we have a different matter. We now have a different judge making that analysis and saying, wait a second, I am specifically looking at the statute. I am specifically looking at the cases that the people cited. I agree with the statute. I agree with the cases. I agree with Supreme Court case law. Unquestionably, that statement by the original trial judge is problematic. But at this point, we've overcome that because we've had a full and fair hearing based on whether or not accountability is appropriate and whether or not it was a legal sentence. Yes, first time around, if this court had determined remand on that alone, it probably would have been correct. I don't think I would have had a problem calling the state's attorney and saying, you should have said something. Well, that's another thing. There are just sort of standing there, you know. And again, you know. Maybe. Again, other than taking the poll again, I'm not sure what I can say other than the fact mistakes are made in trials. A defendant isn't entitled to a perfect trial, isn't entitled to a fair trial. Would that have been a problem on direct appeal? Yes. Is that a problem now that you've had, that he's had a full hearing on the issue? No. This is done. Thank you. Thank you very much. And Mr. May it please the court as for the sufficiency of the affidavit. This didn't occur to me until yesterday, but it's not a hearsay affidavit. She confessed to committing the crime of perjury. So if it's hearsay, it's admissible hearsay. But let's assume that it is hearsay. It's still a sufficient affidavit. The post-conviction statute doesn't bar hearsay in an affidavit. It only says it has to support the defendant's allegations. Even if it is hearsay, this affidavit meets the purpose of the statute. Is the information capable of objective verification? Sure. You call Gloria Driver. You call the police officer who supposedly paid her. You call the state's attorney who told her not to talk about the time frame. Does it identify the source? Yes, we all know who those three people are. Is there enough information to make the source available? Yes, the state found Gloria Driver. You're not required to get an affidavit from a hostile or unavailable source. And obviously the problem here is Mr. Driver, a prison inmate, a layman who likes to write long and lengthy legal proceedings, understands apparently that affidavits should be brief. And he didn't explain why he couldn't find Gloria Driver or why she wouldn't cooperate with him. But that doesn't mean that she wouldn't. I mean, it's implicit in the affidavit that he would have gotten it from her if he could have. Now, why she wouldn't cooperate, I don't have any idea. Perhaps she testified that he was making it up. Perhaps she testified she lied the first time. I don't know. But it's implicit in the affidavit that he could not get an affidavit from her. And that ought to be enough. You know, this isn't just – it meets all those other requirements. So the fact that it's just not going to open the floodgate for some guy saying, I heard this was true out on the street and I want an evidentiary hearing. Everybody knows what's going on here. And they ought to overlook the fact that Mr. Driver would say she wouldn't return my calls or she won't talk to my family or whatever it may have been. But he did have a lawyer during some of this process who had, obviously, better access to everything that was outside of those prison walls. Well, let's get started on that lawyer in this proceeding. You know, Mr. Driver had to go pro se because that lawyer wouldn't raise any of his claims other than this perjury one. So Mr. Driver has got the Hobson's choice of, gee, if I want this lawyer to help me on this claim, I've got to give up all my other claims, and he says, are frivolous. And I don't know what you want to say about how meritorious these claims are, but I think it's rather offensive that a trial lawyer couldn't have made something out of some of these claims. So really, Mr. Driver had to choose between advancing all of his claims, like the DNA claim, or having the assistance of counsel. So where did that leave him? Well, he made the choice that meant he doesn't have an affidavit from Gloria Driver. And I think that's perfectly explainable and understandable under the circumstances of this case. You know, the trial lawyer is a red herring because he really was not being helpful to Mr. Driver in this case. They just wanted to move this case along. You know, this court pointed out a lot of fallacies in the state's case, and a lot of these issues that Mr. Driver raised dealt with those fallacies, but that lawyer said they're not worth my time and effort. As for me, unless there are more questions on the affidavit, as for the 85%, I think what is unique about this case, absolutely unique, is he has been acquitted of inflicting great bodily harm upon this victim, yet the trial judge sentenced him for that based on accountability. Because the jury could have convicted him on the basis of accountability of the attempt murder, but they did not. He's not legally responsible for that gunshot that caused the great bodily harm. Therefore, we have a specific finding in this case that he is not responsible, and the general accountability rule goes out the window. The general rule is fine. There's no doubt that generally you're accountable, but he's been acquitted. You know, let's take a look at Apprendi, which doesn't apply because of the 85% rule, but in a way it's instructive. All Apprendi says is, you know, you have a right to a fact finding on some certain issues. Now, Apprendi doesn't say anything that if Apprendi doesn't apply, the judge can ignore a finding of fact that the jury makes anyway. Mr. Driver can't be sentenced for a crime he was acquitted of. Because he was acquitted of being responsible for firing this gunshot, he can't. He's not accountable. He can't be sentenced for the great bodily harm. And I would point out an oddity in the instructions and the convictions in this case. If my notes are correct, the finding for the co-defendant of the great bodily harm was not presented as a separate finding. If my notes are correct, I haven't seen the record. Can I finish briefly? It was included as an element of the armed robbery instruction. So if the jury didn't think the shooting was part of the armed robbery, they thought it was a gratuitous act of violence after the armed robbery was over, they would have to acquit Mr. Ellis of armed robbery because that finding of fact was an element of the armed robbery offense. So rather than, assuming my memory is correct, rather than acquit Mr. Ellis of a crime, they obviously knew he was guilty of, they made a finding they didn't believe, that the gunshot was fired during the armed robbery. Thank you very much. And I think we're back, Counsel. Thank you, ladies and gentlemen. Some of you have been here for a long time today, as have we. We appreciate your attendance and your attention. We will take this matter under advisement. We will issue the decision in due course, and we are standing adjourned. Thank you.